**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | | |
|---|---|---|
| FOUR WINDS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 2:02 CV 368 PS |
| v. | ) | |
| | ) | |
| AMERICAN EXPRESS TAX AND | ) | |
| CONSULTING SERVICES, INC. and | ) | |
| SCOTT PELTZ, | ) | |
| | ) | |
| Defendants. | ) | |
| ------------------------------------------------------- | | |
| AMERICAN EXPRESS TAX AND | ) | |
| BUSINESS SERVICES, INC., | ) | |
| | ) | |
| Third-Party Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BANK ONE, N.A., | ) | |
| | ) | |
| Third-Party Defendant. | ) | |

**OPINION AND ORDER**

When Bank One sued Four Winds LLC to foreclose on a mortgage relating to the

doomed construction of an apartment complex, a receiver was needed to protect the partially

completed project while the foreclosure action was pending.  Four Winds and Bank One agreed

that defendants American Express Tax and Consulting Services, Inc. and Scott Peltz

(collectively "Am Ex") would serve as the receiver.   While the property was in receivership, it

deteriorated to such an extent that it was eventually condemned and ordered razed by a state

court judge.  Assessing who is at fault for this mess is at the center of the action currently before

the Court.

This matter is before the Court on the cross motions for summary judgment brought by Plaintiff Four Winds and Defendant Am Ex. [Docs. 87, 90, 93, 97].  Am Ex also brought a third party action against Bank One and Bank One has filed its own motion for summary judgment. We will address Bank One's motion in a separate order.

## BACKGROUND

The following is a brief history of both the real estate development project and the underlying state court litigation.

**A.      The State Court Foreclosure Action**

Four Winds originally set out to develop a multi-building apartment complex to be constructed in Winfield, Indiana ("the Project").  The Project was to consist of eight multi-story buildings.[1]  To finance the Project, Four Winds obtained a $7,450,000.00 mortgage loan from Bank One.  As far as we know, the Project proceeded without incident until September 26, 2000 when Bank One filed a foreclosure action in Lake County Superior Court against the Project property.  *See Bank One, Indiana, N.A. v. Four Winds, LLC, Edward J. Mueller, II, et al.* Cause No. 45D01-009CP332.

As part of the foreclosure action, Four Winds filed counterclaims against Bank One asserting breach of contract, negligence, fraud and promissory estoppel.  In essence, Four Winds claimed that Bank One had filed the foreclosure action hastily and that Bank One's allegation that Four Winds was in default was incorrect.

---

[1]The exact layout of the Project is unclear.  The parties variously refer to three buildings, four buildings, and eight buildings.  According to the Plaintiffs, there are eight letters (J-Q) that correspond to various "buildings," but it seems that there may be fewer actual structures on the property with each structure comprised of more than one lettered "building."  For purposes of this motion, we will consider the Project to consist of the eight lettered building sections.

The foreclosure action went to trial on May 28, 2003. After Bank One concluded its case in chief, the Lake County Superior Court entered an order finding that Four Winds was not in default of the loan agreement and dismissed Bank One's foreclosure complaint. Four Winds then proceeded to trial on its counterclaims. In the midst of trial, and before any judgment was rendered against either party on Four Winds' counterclaims, Bank One and Four Winds settled Four Winds' remaining claims. The terms of the settlement agreement are confidential and were filed with this Court under seal.

At the time of the Bank One/Four Winds settlement, Four Winds had already brought this action against Am Ex. Am Ex's involvement in the Project is described below.

**B.      Appointment of Am Ex as the Receiver and Designation of Its Duties**

As part of the foreclosure action (and pursuant to Indiana statute), Bank One sought the appointment of a receiver for the Project. On September 28, 2000, the Lake County Superior Court entered a Stipulated and Agreed Order Appointing Receiver (the "Stipulated Order") that appointed Am Ex as the receiver. Both Bank One and Four Winds participated in the drafting and approval of the Stipulated Order as well as the choice of Am Ex as the receiver.

The Stipulated Order provided that:

> the receiver shall manage, operate, and make improvements on the Real Estate to the extent necessary to maintain, preserve and protect the Real Estate. American Express is directly authorized by the Court to do any and all acts it deems proper to maintain, protect and preserve the Real Estate during the pendency of this action, until such time as the Real Estate is sold by order of this Court or until further actions or orders of this Court.

(Stipulated Order at ¶ 1). The Stipulated Order further authorized the receiver to contract with a service or use its own employees to provide management or any other operations; to institute, carry on, and defend legal actions regarding the property; to pay expenses associated with the

property, including utility and sewer charges, taxes, and assessments; and to obtain insurance for the property.  (*Id*. at ¶¶ 1, 5, 6, 9).

Am Ex's powers under the Stipulated Order were not without limitation.  For example, Am Ex was authorized to make minor repairs to the partially completed buildings, but could not make substantial improvement or repairs exceeding $5,000.00 without prior approval of the court.  (*Id*. at ¶ 9).  Moreover, Am Ex was "not authorized to take any steps toward or to continue construction on the Real Estate for the purpose of completing any improvements thereon *except as is necessary to maintain, preserve and protect the Real Estate*."  (*Id*. at ¶ 1) (emphasis added).

Paradoxically, Am Ex was directed to maintain separate bank accounts for all funds that the receivership received from the property and Am Ex was to use only receivership funds to maintain the property – Am Ex was not required to advance its own funds for any expenses relating to the Project.  (*Id*. at ¶¶ 11, 12).  This provision is a bit bewildering inasmuch as the Project was not yet completed and none of the apartments were habitable.  Because the Project was incomplete and, thus, unavailable to rent, Am Ex did not have any receivership funds.  However, Bank One agreed to pay for certain improvements to protect the property, real estate tax costs, and insurance costs.  Indeed, Bank One agreed to pay for whatever protective measures were necessary to maintain the Project and did not set a specific budget limit for those measures.  (Rhum Aff. at ¶¶ 10, 11).   Importantly, Am Ex could apply to the court to alter its powers under the Stipulated Order if necessary to enable Am Ex to execute its duties under the order.  (Stipulated Order at ¶ 13).

**C.**     **The Status of the Project When Am Ex Became Receiver**

At the time of the foreclosure action and Am Ex's appointment as receiver, construction on the Project was not complete, but the exact level of completion is unclear.  According to the

Plaintiff's expert, Tarif El-Naggar, various buildings were in different states of completion. El-Naggar used both his individual observations during a site-visit and an analysis of payout requests to determine the percentage completion. Specifically, El-Naggar estimated that Buildings J and K were approximately 25% complete, Buildings L and M were 90% complete, Buildings N and O were 75% complete, and Buildings P and Q were 50% complete.

Separately, Four Winds principal Edward Mueller testified at his deposition that he believed the buildings to be substantially less complete than El-Naggar's estimates. Mueller estimated that Buildings L and M were 65-75% complete, that Buildings J and K were 20-25% complete and that Buildings N, O, P, and Q were all just 30-35% complete.[2]

Mueller did not base his opinions on a pay-out analysis or other statistical method, but he did have extensive knowledge in the day-to-day operation and status of the Project. Mueller was the "managing member" of Four Winds LLC who "was responsible for developing the project" and, as such, he was responsible for the "accumulation of invoices, completion of sworn owner's statement and sworn construction statements, negotiations and follow through with regards to materials and invoices, and [he] was the liaison to Bank One." (Mueller Dep. at 18, 21-22). In addition, Mueller participated in the construction of the Project through his involvement with D.M.M. Construction, a partnership which worked on framing, HVAC, stucco application and some excavation for the Project. (*Id*. at 20). Mueller also described the status of the Project's construction in detail noting specifics such as that Buildings J and K had a complete foundation, that 16 out of 24 units were completely framed, that there was plywood covering 50% of the roof space, and that there were no windows in place. (*Id*. at 29-30). Mueller offered similar testimony as to the remaining buildings.

---

[2]Four Winds has moved to strike the deposition testimony. For the reasons set forth in Section II.A, that motion is denied.

Am Ex took control of the Project on September 28, 2000.   It appointed Scott Peltz, a partner in its Chicago office, to oversee its activities as receiver.   Am Ex employees visited the Project with Marvin Francis, a principal in the general contracting firm of Intercor, in September 2000 and assessed the condition of the property.  Francis found that Buildings L and M had completely shingled roofs, all windows installed, and exterior stucco that was partially complete.  No doors were installed in Buildings L and M.  Wood sheathing was exposed in the areas that did not have stucco.  Buildings N, O, P, and Q had a plywood roof deck in place, but were only partially shingled.  No windows or doors were installed nor was there any stucco installed.   As such, bare vertical sheathing was exposed.  Finally, Buildings J and K had only partially built roofs that had no shingles and some exposed trusses.  There were no windows or doors installed nor was there any stucco or even vertical sheathing installed on the exterior of those buildings.

Am Ex hired Intercor to implement protective measures on the Project.  Intercor began work in October 2000.  Initially, it boarded up all of the door and window openings in the partially-constructed buildings[3] and wrapped the exterior of the buildings with house wrap to protect exposed wood sheathing from the elements.  Intercor also installed tarpaulins on partially constructed roofs.  The initial work was completed in November 2000 and cost $65,949.  In November 2000, Am Ex hired VFP Fire Prevention Systems to remove the sprinkler heads from the sprinkler systems in the buildings in order to allow water to drain from the sprinkler system to minimize potential freeze damage.  At some point during October and November of 2000, Intercor also installed a fence around the perimeter of the Project.

Thereafter, Am Ex did little to visit or inspect the property during the winter of 2000-01.  Mike Lane, an Am Ex employee, testified that he visited the property once in January 2001, but

---

[3]The Plaintiffs assert that Intercor only boarded the windows on the first story of the buildings.  The Defendants suggest that Intercor boarded all of the window and door openings.

little is known of what he actually did during this visit.  Marvin Francis, the Intercor principal,

testified that he also visited the Project in January 2001, but he did not leave his car to inspect

any of the buildings on the property.

**D.      Deterioration of the Project**

By Spring 2001, it was apparent that many of the protective measures Am Ex

implemented were failing.   Peltz testified that as of April 2001, the tarps on the roof of one of

the buildings had blown off, the wrapping on two other buildings had been damaged, and there

was significant water collecting in all of the buildings.   However, it does not appear that Am Ex

took any immediate action to correct this damage nor did Am Ex inform the Court of the

Project's deterioration.

In June 2001, the Lake County Building Department inspected the Project and issued a

letter to Bank One stating that the Project was being considered a possible health hazard and was

in danger of being condemned for being unsafe.   The inspection found that the buildings were

unsecured; the basements and crawl spaces were filled with water; mildew was growing on the

floor decking; lumber and trusses were weather-damaged; and live electrical cables were

exposed across the property.

Four Winds also performed its own inspection in July 2001.  They retained Mark Stern, a

structural engineer, who found significant damage at each building.  For example, Stern found

approximately three feet of water in the crawl space of one building.  The water was deep

enough to cover the wood beams that support the floor trusses on the first floor thereby

threatening the structural integrity of the building.  Stern also concluded that the protective

material that Intercor used was insufficient to protect the buildings from the harsh realities of a

Northern Indiana winter.  As a result, there was significant mold growth throughout the

buildings.  Stern also noted that vandals had accessed the property and caused damage to the

insides of the buildings.  Ultimately, Stern opined that the damage to the buildings was so great that the buildings could not be salvaged.

It is unclear what efforts, if any, Am Ex took in response to the Lake County condemnation threat.  Bank One drafted a letter suggesting a number of improvements, but neither party explained whether those improvements were actually made.  Regardless, the Project was not condemned in the summer of 2001.

With another autumn and winter approaching and no apparent end to the foreclosure action, Am Ex again hired Intercor to install additional protective measures in August and September of 2001.  Once again, Intercor installed tarpaulins on the roofs, covered the buildings in house wrap, boarded all windows that were disturbed by vandals, and pumped water out of the crawl spaces.  This work was completed for a cost of $49,060 which was paid by Bank One.  Although Scott Peltz testified that by this time Am Ex was aware of the mold growth in the buildings, it does not appear that Intercor performed any work to eradicate the mold.

The Plaintiffs do not dispute that Am Ex took additional steps to protect the Project, but they do dispute that the additional work had any beneficial effect.  In October 2001, Four Winds' engineer Stern once again visited the Project and found that it had deteriorated even further with additional standing water throughout the buildings and a significant level of mold growth.  Thereafter, sometime in the spring of 2002, Am Ex pumped water from the buildings.  Other than the Spring 2002 pumping project, it is unclear what, if any, protective measures that Am Ex took after the Fall of 2001.

Ultimately, in October 2003, the buildings were demolished pursuant to court order after the Lake County Planning Commission sued Four Winds under the Lake County Unsafe Building Ordinance.  The foundations of the buildings were left intact and, so far as we know, they remain intact today.

**E.      Am Ex's Communications with the Lake County Superior Court**

The record before us suggests that Am Ex was less than diligent in informing the Lake County Superior Court about its activities as receiver.  Pursuant to the Stipulated Order, Am Ex was to provide the Lake County Superior Court with interim reports on its activities as receiver.  Specifically, the Stipulated Order provided:

> The receiver is directed to prepare and file with the Court for its approval, within forty-five (45) days after the date of this order and no less frequently than quarterly thereafter, so long as any part of the Real Estate remains in its possession . . . .  The receiver is further directed to serve copies thereof on the attorneys of record for the defendants, and the plaintiff, and any other party who submits a written request tot he Court to obtain copies of the report.

(Stipulated Order at ¶ 7).  Despite this requirement, the receiver provided its first interim report to the Court on October 1, 2001 – more than a year after taking over as receiver and well-outside the deadlines set forth in the Stipulated Order.  The first interim report discussed the condition of the Project in general, but did not lay out the specific efforts that Am Ex had undertaken nor did it discuss the deterioration of the Project between September 2000 and October 2001.  Am Ex filed only one additional interim report in April 2002 before filing its motion to resign as receiver in September 2002.  The Lake County judge denied Am Ex's motion to resign.  Thereafter, Am Ex filed its final report in April 2003.  Interestingly, Am Ex does not explain – nor even address – its failure to file required reports in any of its briefing on summary judgment.

**F.      Disputes Between Four Winds and Am Ex**

As early as August 2001, it is clear that Four Winds and Am Ex strongly disagreed on how Am Ex was handling the property.  First, Mueller filed a Motion for Rule to Show Cause asking that Am Ex be held in contempt of court for violating the Stipulated Order by failing to implement adequate protective measures.  Second, Am Ex filed a Motion for Leave to Sell Real Estate asking that they be allowed to sell the Project since it could not operate as an apartment complex and, therefore, Am Ex had no funds with which to maintain it.   We note that nowhere in this application did Am Ex apply for leave to complete the Project nor did it apply for additional funds to complete the Project.  Instead, it argued that the Project should be sold to some other party who could then choose to finish the Project.  While it is reasonable to infer that Four Winds objected to the sale of the Project which had not yet been foreclosed, because the parties' have not provided us with Four Winds' response to this motion, there is no evidence that Four Winds objected to additional construction on the Project – just to the sale of the Project.

Before the court could rule on those two motions, Four Winds filed a Motion for Leave to Sue the Receiver alleging that Am Ex had willfully, wantonly and negligently failed to take adequate measures to protect the Project. Under Indiana law, court approval is necessary to sue a receiver.  Magistrate Judge Pete held a hearing on the motion in November 2001.  No evidence was taken at the hearing;  Judge Pete merely heard arguments from counsel. In December 2001 the motions were denied.  In his ruling, Magistrate Pete praised Am Ex's services as receiver noting that it "went above and beyond its responsibilities under the terms of the order" by prevailing upon Bank One to pay for protective measures when faced with a complete lack of receivership funds.

However, this was not the end of the story.  In February 2002, Four Winds filed a motion to reconsider its motion for leave to sue the receiver.[4]  Judge Diane Schneider of the Lake County Superior Court conducted an evidentiary hearing on the motion to reconsider over the course of two days in May and June 2002.   Judge Schneider overturned Magistrate Pete's decision and found that Four Winds had "presented sufficient evidence to show that there exists a reasonable probability that the Receiver committed gross negligence under the accepted definition of Indiana law."  (Lake Co. August 20, 2002 order at 5).  In so holding, Judge Schneider noted that Magistrate Pete did not hold an evidentiary hearing, but rather merely heard arguments of counsel.  (*Id*. at 2).  Further, Judge Schneider found that Am Ex "was authorized to complete construction for the purposes of preserving, protecting and maintaining the [Project]" and that Am Ex "could have taken reasonable measures at reasonable cost to prevent or lessen the risk of damage to the Property."  (*Id*.).  Judge Schneider also found that Am Ex failed to keep the Court informed of its actions as receiver by failing to file interim reports as required by the Stipulated Order.  (*Id*. at 2, 4, 5).

After receiving Judge Schneider's ruling, Four Winds brought this action against Am Ex in Lake County Superior Court.  Am Ex removed the action to this Court on September 13, 2003.  Four Winds filed its Amended Complaint on February 13, 2004 alleging gross negligence and fraud against Am Ex.

---

[4]Apparently, the Court took no action on this motion and it was denied by operation of Indiana Law.  *See* Ind. Tr. R. 53.4.  Four Winds again renewed its motion to reconsider in April 2002 by filing an "additional application" for leave to sue the receiver.  However, the Lake County Superior Court did not distinguish between the February and April motions in its ruling on the April motion.

G.      **Damage Calculation**

As part of its claims against Am Ex, Four Winds claims that it is entitled to $4,167,881

which represents the value of the Project at the time of the foreclosure action minus the value of

the foundations which remain intact after the demolition of the Project buildings in 2003.  Four

Winds' expert El-Naggar arrived at this number by assigning a percentage complete to each

building.  (*See* El-Naggar Report attached to [Doc. 92-1] as Ex. G).  Using industry standards, he

assigned a cost per square foot to complete the buildings and multiplied that amount by the

percentage complete.  (*Id*.).  Using these calculations, El-Naggar concluded that the construction

value of the partially completed project was $4,608,804.  (*Id*.)  However, because the

foundations remained intact, El-Naggar subtracted the value of the foundations from that

amount. He estimated that the foundations had a value of $5.00 per square foot and calculated a

"foundation discount" for each building.  (*Id*.). Applying those discounts to the total cost-to-

complete, El-Naggar arrived at his final figure of $4,167,881.

The $4,167,881 value of the Project is only a portion of the damages that Four Winds

claims in its lawsuit against Am Ex.  However, only this item of damages is at issue in the

pending motions for summary judgment.

## II.  DISCUSSION

### Motion to Strike

As a preliminary matter, we address Four Winds' Motion to Strike the deposition

testimony of its own principal Edward Mueller regarding the Project's level of completion at the

time Bank One instituted the foreclosure action [Doc. 114].  In sum, Four Winds argues that

Mueller's testimony is inadmissible expert testimony under Fed. R. Civ. P. 702 because it is

based on guess and conjecture.  We need not decide whether Mueller's testimony is admissible

as expert testimony under Rule 702 because we find that it is admissible as a lay opinion under

Fed. R. Evid. 701.

> Rule 701 provides:
>
>> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inference which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on the scientific, technical, or other specialized knowledge within the scope of Rule 702.

*Id*. The advisory committee notes to this rule clarify when a lay opinion is appropriately

considered. Citing *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153 (3rd Cir 1993), the notes

provide that "most courts have permitted the owner or officer of a business to testify to the value

or projected profits of the business, without the necessity of qualifying the witness as an

accountant, appraiser, or similar expert." Fed. R. Evid. 701 advisory committee note. This type

of opinion testimony "is admitted not because of experience, training or specialized knowledge

within the realm of an expert, but because of the particularized knowledge that the witness has

by virtue of his or her position in the business." *Id*; *see also*, *Palmer v. Rice*, 2005 WL 1278262

at * (D.D.C. May 27, 2005) (discussing *Lightening Lube*); *KW Plastics v. United States Can

Co.*, 131 F. Supp.2d 1265, 1273 (M.D. Ala. 2001) (same). Thus, we must closely examine the

foundation of the witness's opinion to ensure that "through contacts with the subject [the

witness] had a reasonable opportunity to form an opinion." *KW Plastics*, 131 F. Supp.2d at

1274.

> In this case, Mueller had close and frequent contacts with the Project as well as intimate

knowledge of its progress. Mueller testified at his deposition that he was the "managing

member" of Four Winds LLC who held a variety of duties overseeing day-to-day operations

including dealing with materials and invoices. In addition, Mueller participated in the actual

construction of the Project through his involvement with D.M.M. Construction.   Although Mueller couched his estimates in terms of "guesses", he very specifically described the state of construction on each of the buildings in the Project.

Mueller clearly has the type of personal knowledge and day-to-day involvement in the Project that allows him to provide a lay opinion on the Project's level of completion without basing his knowledge on some particularized skill or technical knowledge that we would require of an expert.   Because Mueller's opinions are "rationally based on perception" and are helpful to "the determination of a fact in issue" his testimony is admissible as lay opinion.   *See* Fed. R. Evid. 701.   Four Winds Motion to Strike [Doc. 114] is therefore **DENIED**.

## Motions for Summary Judgment

This order addresses only those motions filed between Am Ex and Four Winds.   We resolve Third Party Defendant Bank One's Motion for Summary Judgment in a separate order. In addition, we limit our discussion to issues surrounding Four Winds' claims that Am Ex committed gross negligence.   Although the Amended Complaint also contains a count alleging that Am Ex committed fraud in its handling of the receivership, surprisingly neither party's briefing addresses the fraud count.

Four Winds filed three separate motions for summary judgment.   In its Motion for Partial Summary Judgment on the Issue of Liability [Doc. 88], Four Winds argues that Am Ex was grossly negligent in the performance of its receivership duties and asks that we find as much as a matter of law.   Second, in its Motion for Partial Summary Judgment on the Minimum Amount of Damages [Doc.90], Four Winds argues that, at minimum, it is entitled to recover $4,167,881 from Am Ex in the event that Am Ex is found liable.   Third, Four Winds filed its Motion for Partial Summary Judgment on the Issue of Settlement Proceeds [Doc. 93] in which it argues that

Am Ex is not entitled to set-off settlement funds that Four Winds received from Bank One in the underlying foreclosure action.

Defendant Am Ex responded to each of Four Winds' motions and also filed its own Motion for Summary Judgment [Doc. 97] arguing that it did not commit gross negligence or malfeasance in the discharge of its duties as receiver.   We first address the parties' cross-motions on the issue of liability and then address Four Winds' remaining motions.

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  *See Howard v. Lear Corp. EEDS & Interiors*, 234 F.3d 1002, 1004 (7th Cir. 2000); *Mills v. Health Care Serv. Corp.*, 171 F.3d 450, 458 (7th Cir. 1999).  A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica, Ind.,* 259 F.3d 619, 625 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).  When examining the evidence, the Court should resolve all ambiguities and draw all inferences in favor of the non-moving party.  *Haefling v. United Parcel Serv., Inc.,* 169 F.3d 494, 497 (7th Cir. 1999); *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1453 (7th Cir. 1994).

**A.      Cross Motions for Summary Judgment Regarding Liability**

The parties agree that, under the terms of the Stipulated Order, as a court ordered receiver Am Ex must have acted with gross negligence or malfeasance in order to be liable to Four Winds for damage to the Project.  According to Four Winds, Am Ex's gross negligence is so patently obvious that we may find it liable as a matter of law.  On the other hand, Am Ex argues that because the terms of the Stipulated Order prevented it from completing construction on the project, it could not have prevented the damage that occurred.  Thus, according to Am Ex, it did not act with gross negligence.  Ultimately, a jury must decide which party is correct.

Under Indiana law, gross negligence is defined as " a conscious, voluntary act or omission in reckless disregard of . . . the consequences to another party." *Northern Ind. Pub. Serv. Co. v. Sharp*, 790 N.E.2d 462, 465 (Ind. 2003) (internal quotations and citations omitted); *see also*, *Stump v. Commercial Union*, 601 N.E.2d 327, 334 (Ind. 1992).   In general, whether a defendant owes a duty of care to the plaintiff is a question of law for the court to decide and whether a particular act or omission is a breach of that duty is a question of fact reserved for the jury.  *Sharp*, 790 N.E.2d at 466.

In this case, Am Ex does not argue that it did not owe a duty of care to Four Winds.  As a the receiver on the Project responsible for protecting the integrity of the partially completed buildings, clearly it did.  Instead, Am Ex argues that it did not breach that duty and that it is entitled to such a ruling as a matter of law.[5]  We disagree.

Am Ex principally argues that Four Winds is estopped from complaining that Am Ex acted with gross negligence.   Am Ex explains that Four Winds expressly agreed to the Stipulated Order that prevented Am Ex from completing construction on the Project and prohibited it from expending additional funds without prior court approval.  Am Ex then cites to deposition testimony in which Mueller admitted that he did not want Am Ex to complete construction on the Project, but that completing construction would have been the best way to protect the Project.  Thus, Am Ex argues that the doctrine of judicial estoppel prevents Four

---

[5]Am Ex repeatedly cites to Magistrate Pete's order denying Four Winds' Motion for Leave to Sue Receiver as evidence that it did not act with gross negligence.  We find this reliance odd.  Upon motion for reconsideration, Judge Schneider expressly overruled Magistrate Pete's findings noting that he did not hold an evidentiary hearing, but rather relied solely on the arguments of counsel.  Judge Schneider further held that Four Winds presented evidence that demonstrated there was a reasonable probability that Am Ex committed gross negligence.  Judge Schneider's order, not Magistrate Pete's order is the law of the case and, therefore, we are not bound by any of Magistrate Pete's findings.

Winds from claiming that Am Ex acted with gross negligence by failing to complete

construction on the project and/or expending additional funds to protect the Project.

Even though this is a diversity case, the Seventh Circuit instructs that we are to apply

federal (not Indiana) law with respect to whether judicial estoppel applies. *Jarrard v. CDI

Telecommunications, Inc.*, 408 F.3d 905, 914 (7th Cir. 2005).  It is well established that the

doctrine of judicial estoppel acts "to protect the integrity of the judicial process . . . by

prohibiting parties from deliberately changing positions according to the exigencies of the

moment."  *New Hampshire v. Maine*, 532 U.S. 742, 749-50, 121 S.Ct. 1808, 149 L.Ed.2d 968

(2001) (internal quotations and citations omitted).  Judicial estoppel is an equitable doctrine

which, when boiled to its essence, seeks to prevent a party that prevails in a lawsuit on one

ground from renouncing that same ground in another lawsuit. *Jarrard*, 408 F.3d at 914;

*Levinson v. United States*, 969 F.2d 260, 264 (7th Cir.1992) (Judicial estoppel "protect[s] the

courts from being manipulated by chameleonic litigants who seek to prevail, twice, on opposite

theories.").

In *Jarrard*, the Seventh Circuit identified four factors to consider in determining whether

the doctrine of judicial estoppel should apply: 1) whether the party is actually taking an

inconsistent position from a position taken earlier;  2) whether the party prevailed on that

position in the earlier action; 3) whether the party taking the inconsistent positions would derive

an unfair advantage if he were not estopped;  and 4) whether the operative facts remained the

same in both cases.  *Id.* at 914.

In this case, Four Winds is not truly taking an inconsistent position.  While it is true that

Four Winds helped draft the Stipulated Order which limited Am Ex's ability to complete the

Project, nothing in the Stipulated Order actually prevents Am Ex from doing so if such

construction is necessary to maintain, preserve or protect the Project.   In fact, the opposite is

17

true: the Stipulated Order expressly provided that Am Ex ***could*** take steps toward completion of the Project if necessary to maintain, preserve and protect the Project.  (*See* Stipulated Order at ¶ 1).   Moreover, while Four Winds repeatedly stated a preference that they be allowed to complete the construction of the Project, Four Winds never stated that under no circumstances was Am Ex to complete the construction.   If Am Ex had taken the initiative to inform Four Winds that completion of the project would be the only effective way to protect it and had Four Winds still protested that course of action, Am Ex would be in a much better position now.  However, there is no evidence in the record that Am Ex timely appealed directly to Four Winds (or to the Lake County Court) to allow them to complete construction.[6]   The only time Am Ex's activities were before the Lake County Court was the series of cross-motions between Mueller/Four Winds and Am Ex.  After careful review of all of the briefing on those motions, it is clear that the position that Four Winds took in that series of motions is identical to the one it has adopted in this action:  that Am Ex failed to adequately protect the Project.

As to the second and fourth *Jarrard* factors, the dispute between Am Ex and Four Winds was never fully adjudicated in the State Court action.  Ultimately, the Lake County Court denied Four Winds' motion for a show cause order and denied Am Ex's application to sell the Property – leaving both parties in the same position they were in before they filed their respective motions.  Moreover, as noted above, Magistrate Judge Pete's decision that Four Winds could not sue the receiver was expressly overturned by Judge Schneider in part because Magistrate Judge Pete did not hold an evidentiary hearing to evaluate the facts, but rather merely heard the

---

[6]Am Ex finally asserted the position that construction would be the best protective measure for the Project in its Motion for Leave to Sell the Property in September 2001 – over a year after Am Ex took control of the Project and after the vast majority of the damage to the Project had already occurred.   Moreover, while it is reasonable to infer that Four Winds objected to the sale of the Project which had not yet been foreclosed, there is no evidence that Four Winds objected to additional construction on the Project.

argument of counsel.   As such, nothing regarding Am Ex's alleged negligence was actually resolved (and no party can be said to have prevailed) in the Lake County action.  At most, the Lake County Court granted Four Winds the ability to file this action in which it is free to pursue the claims originally brought, but never resolved, in the Lake County Court.

Finally, as to the third factor, it is hard for the Court to conceive of how Am Ex is prejudiced by allowing Four Winds to argue that Am Ex should have done a better job to protect the property simply because Four Winds would have preferred that Am Ex not complete construction.  While completing construction of the Project may have been the best way to protect it, it is not clear from the evidence before the Court that it was the *only* effective way to protect the Project.  Am Ex was able to make expenditures in excess of $5,000.00 and/or in excess of available receivership funds if it obtained prior approval of the Court.  (Stipulated Order at ¶¶ 9(d), 9(g)).  If these provisions were not enough to empower Am Ex to carry out its duties (or if Am Ex truly believed that completing the project was the only way to protect it), Am Ex could have applied to the Lake County Court under Paragraph 13 of the Stipulated Order for the additional powers that it felt it was lacking in order to adequately protect the Project.  For whatever reason, Am Ex did not pursue this option.  Therefore, we fail to see how Four Winds is deriving "an unfair advantage" over Am Ex in allowing it to take the position it now asserts – that Am ex was grossly negligent in discharging its duties as receiver. *Jarrard*, 408 F.3d at 915.

In sum, our review of the four *Jarrad* factors demonstrates that Four Winds should not be judicially estopped from taking the position it now takes in this litigation.

However, this does not mean that Am Ex is entitled to summary judgment on the issue of liability. Far from it. Even with a myriad of options available to Am Ex, it is far from clear that Am Ex's failure to pursue those options constitutes gross negligence.  Establishing gross negligence is an exacting standard.  *Sharp*, 790 N.E.2d at 465-466 (explaining that while a

showing of ordinary negligence can be made by merely showing that the defendant breached a duty owed to a plaintiff, a showing of gross negligence requires a "conscious, voluntary act" made "in reckless disregard" to the consequences").  Am Ex certainly undertook some protective measures by wrapping the buildings in house wrap, boarding up exposed window and door frames, and installing tarpaulins on incomplete roofs.   Moreover, while it is clear that the buildings suffered irreparable damage, it is not clear what level of protection would have been necessary to prevent that damage.  Whether Am Ex's failure to continually check and repair the protective measures that it did install and/or whether Am Ex's failure to install more extensive protective measures amounts to gross negligence is a question for the jury to decide.  *See Sharp*, 790 N.E.2d at 466.  This case thus presents unresolved questions of material fact which include, but are not limited to:

1.    How would the Project have faired if Am Ex had not undertaken the protective measures that it did?

2.     How much damage would more extensive protective measures have prevented?

3.    Why didn't Am Ex apply to the Court for permission to complete the Project or for funding to implement more extensive measures?

4.    How many times should Am Ex have visited the Project during winter 2001-2002?

5.    Was Am Ex grossly negligent in fulfilling its duties as the receiver?

Because these questions of material fact remain, we **DENY** both parties' cross-motions for summary judgment on the issue of liability.

**B.    Summary Judgment Regarding the Minimum Amount of Damages**

In a separate motion for summary judgment, Four Winds asks this Court to find that it is entitled to recover, at minimum, $4,167,881 as damages in the event that Am Ex is found liable of gross negligence.   However, we find substantial questions of material fact remain which preclude summary judgment as to this issue as well.

In cases alleging damage to property, Indiana law provides for different measures of damages in different situations. When the injured property is repairable or subject to only temporary injury, the measure of damages is the cost to repair the property. *Warrick County v. Waste Management of Evansville*, 732 N.E.2d 1255, 1258 (Ind. App. 2000). However, where the property is completely lost, the measure of damages is the value of the property before the injury. *Id.* In this case, the buildings (save the foundations) were completely demolished. As such, this case fits into the second scenario and the proper measure of damages is the value of the property before the injury.

Four Winds provided us with a method for calculating the value of the Project by calculating the square footage cost to construct the Project and multiplying that amount by the percentage complete of each building. Using this calculation, and subtracting the value of the foundations which remain intact, Four Winds concludes that it is entitled to $4,167,881 as a matter of law. Although Am Ex does not take issue with Four Winds methodology, it does take issue with the underlying data that Four Winds used to complete its calculation.

Four Winds' expert Tarif El-Naggar arrived at his percentage complete numbers by making observations on a site-visit and by analyzing the pay-out requests for the Project. El Naggar assigned the following levels of completion:

| Building | % Complete |
|----------|------------|
| J | 25 |
| K | 25 |
| L | 90 |
| M | 90 |
| N | 75 |
| O | 75 |

| | |
|---|---|
| P | 50 |
| Q | 50 |

By contrast, Edward Mueller, the Managing Member of Four Winds who was directly responsible for developing the Project and participated in its construction, provided different estimates of completion. Mueller estimated as follows:

| Building | % Complete |
|---|---|
| J | 20 |
| K | 20 |
| L | 65 |
| M | 65 |
| N | 30 |
| O | 30 |
| P | 30 |
| Q | 30 |

Four Winds concedes that if we apply El-Naggar's calculations to Mueller's proposed levels of completion, the value of the Project decreases dramatically to $2,705,847. (Plf. Reply at 7).

Construing facts in favor of the non-moving party, as we must when ruling on summary judgment, it is clear that Four Winds' own data contains a factual dispute which precludes summary judgment on this issue. The true value of the Project is unknown at this time because there are at least two competing numbers. Which number is correct is a fact question which must be determined not by the Court, but by a jury. Accordingly, Four Winds Motion for Summary Judgment on the Issue of the Minimum Amount of Damages is **DENIED**.

**D.**     **Summary Judgment Regarding the Issue of Set-off**

Finally, in its third motion for summary judgment, Four Winds asks the Court for a

declaration that, in the event it prevails in this lawsuit, that Am Ex not be allowed to set-off the

settlement funds that Four Winds received from Bank One in the underlying foreclosure action.[7]

The motion is premature.

Indiana law allows for set-off in certain negligence actions.  Specifically, "where the

actions of multiple defendants cause a single injury to a plaintiff, a defendant against whom

judgment is rendered at trial is entitled to a set off against the assessed damages in the amount of

any funds plaintiff received from any settling joint tortfeasor."  *Marquez v. Mayer*, 727 N.E.2d

768, 774 (Ind. App. 2000).  The right to set-off exists to prevent a plaintiff from recovering twice

for the same injury.  *Id.*   As such, even successive tortfeasors may take advantage of set-off

rights where a plaintiff has already been compensated for both of his injuries.  *Id.*   Thus, the

question becomes whether the plaintiff received partial or whole compensation for an injury

from one settling tortfeasor for an injury caused by a second, nonsettling tortfeasor.  *Id.*

 Four Winds argues that the damages it seeks in this action are wholly separate from the

damages that it was compensated for in the Bank One settlement.   Specifically, the Bank One

settlement sought to compensate Four Winds for delay in construction during the foreclosure

action, Four Winds' loss of credit, and Four Winds' loss of reputation within the real estate

development field as a result of the wrongful foreclosure – or so Four Winds says. In contrast, in

this action, Four Winds contends that it seeks the actual value of the buildings that it lost as a

---

[7]The settlement agreement between Four Winds and Bank One in the underlying
foreclosure action contained a confidentiality provision.  Although the Lake County Superior
Court ordered Four Winds and Bank One to provide a copy of the settlement agreement to Am
Ex, the Court also ordered Am Ex not to disclose any of the terms of the confidential settlement.
Four Winds provided copy of the release to this Court under seal.

result of Am Ex's alleged gross negligence as the Receiver as well as the costs associated with starting the project "from scratch" due to the demolition of the buildings. Thus, Four Winds argues that Am Ex is not entitled to a set-off for the Bank One settlement.

Remember that Four Winds had already brought the present lawsuit against Am Ex at the time Four Winds settled with Bank One. Thus, it certainly would behoove Four Winds to structure the settlement with Bank One in a way that avoids set-off later in the event it prevails against Am Ex. Thus, one might reasonably look askance at the claim that the damages Four Winds received in settlement with Bank One are wholly separate from those sought here.

More to the point, we are presented with the set-off issue in this case in an unusual procedural posture because it comes to us not in a post-trial motion brought by a defendant seeking to enforce the right, but rather in a preemptive motion for summary judgment brought by a plaintiff seeking to avoid the set-off. It appears there may be some overlap between the damages sought in this action and the damages already recovered in the foreclosure action.[8]   In addition, although Four Winds brings its complaint against only Am Ex, it is clear in Count II of the complaint that Four Winds seeks to recover damages from Am Ex for alleged fraud that Am Ex committed together *with* Bank One. Thus, if it's found liable, Am Ex might be entitled to a set-off to the extent that it can prove that Four Winds was already compensated for this fraud in the Bank One settlement. At bottom, however, without knowing what injuries, if any, Am Ex may be liable for, we cannot yet determine whether Four Winds has already been compensated for those injuries.

---

[8]We are particularly concerned with Four Winds' claims for construction delay damages in this action. It appears from the confidential settlement that Four Winds has already received some compensation for some form of construction delay damages as part of that agreement. The record before us does not clarify the difference between those alleged delay damages and the damages that Four Winds wishes to recover in this action.

Accordingly, Four Winds Motion for Partial Summary Judgment on the Issue of Settlement Proceeds is premature and therefore is **DENIED**.  Either party may again raise the set-off issue at the conclusion of trial should Am Ex be found liable.  Additionally, the parties may present to the Court any arguments regarding the use of evidence of the Bank One settlement at trial in a motion *in limine* at the appropriate time.

### III.  CONCLUSION

For the reasons stated above, Four Winds' various motions for partial summary judgment [Doc. 87, 90, 93], Four Winds' Motion to Strike [Doc. 114], and Am Ex's Motion for Summary Judgment [Doc. 97] are all **DENIED**.  This matter is currently set for jury trial on February 20, 2007 with a Trial Management Conference set on February 15, 2007 and a Final Pretrial Conference and Settlement Conference set on January 17, 2007.  The Court hereby **REAFFIRMS** these dates.

**SO ORDERED.**

ENTERED: September 18, 2006

S/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT

25